James **PASCUITI**, Joseph **Reilly**, Walter **Rynakso**, and Theresa **Murphy**, Plaintiffs,

v.

**NEW YORK YANKEES, Defendant.**

**United States of America, Plaintiff–Intervenor,**

v.

**New York City, New York City Department of Parks and Recreation, and the New York Yankees, Defendants.**

No. 98 Civ. 8186(SAS).

United States District Court, S.D. New York.

July 12, 2000.

---

Edward Kopelson, Robert Westreich, Kopelson & Westreich, Morristown, NJ, for James Pascuiti, Joseph Reilly, Walter Rynasko, and Theresa Murphy.

Richard M. Goldstein, Christopher J. Collins, Proskauer Rose LLP, New York City, for New York Yankees.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs James Pascuiti, Joseph Reilly, Walter Rynasko, and Theresa Murphy (the "private plaintiffs") and plaintiff-intervenor United States of America (the "Government") sued New York City and the New York City Department of Parks and Recreation (the "City"), as well as the New York Yankees (the "Yankees"), alleging that the City and the Yankees violated the Americans with Disabilities Act, New York State Executive Law § 296(2), and New York City Human Rights Law § 8–107(4) by failing to make Yankee Stadium (the "Stadium") accessible to individuals with disabilities. On December 13, 1999, this Court entered a 32–page Stipulation and Order of Settlement ("Settlement Order"), signed by all parties, containing various forms of relief and outlining a plan for ensuring compliance. The private plaintiffs now move, pursuant to 42 U.S.C. § 12205, for attorneys' fees and costs.[1]

K & W argues that it is entitled to attorneys' fees and costs because the private plaintiffs were prevailing parties and their lawsuit was a substantial factor in obtaining relief. The Yankees, on the oth-

---

1. Kopelson & Westreich ("K & W"), the law firm that represented the private plaintiffs throughout this litigation, prepared the motion for attorneys' fees and costs. For the sake of convenience, I will refer to the private plaintiffs' request as "K & W's request."

er hand, contend that the private plaintiffs' lawsuit contributed nothing to the eventual outcome and suggest that K & W is trying to reap the benefit of attorneys' fees even though the Government's lawyers did all the work. In addition to this overarching dispute, the parties disagree about a number of K & W's specific fee requests.

## I. BACKGROUND

In November 1994, the Government sent a letter to the Yankees, indicating that it had received a complaint that the Stadium was not in compliance with the ADA. *See* March 24, 2000 Declaration of Richard M. Goldstein, counsel for the Yankees ("Goldstein Decl."), Ex. 1 (November 2, 1994 letter from DOJ Trial Attorney Joseph Russo, Esq., et al. to George M. Steinbrenner, Owner of the Yankees). For the next four years, the Government investigated whether the Stadium was in compliance with the ADA. *See* Goldstein Decl. ¶ 3; Affidavit of Robert Westreich, Esq., counsel for the private plaintiffs ("Westreich Aff.") ¶ 3. In April 1998, the Government sent both the Yankees and the City a letter alleging a number of specific violations and attaching a report prepared by the architectural firm of Evan Terry & Associates. *See* Goldstein Decl. ¶ 4 & Ex. 1 (April 8, 1998 letter from AUSA Robert Sadowski, Esq. to John C. Lawn, Esq., Vice President and Chief of Operations of the Yankees and Marjorie A. Cadogan, Esq., General Counsel, New York City Department of Parks and Recreation).

On July 7, 1998, K & W informed the Yankees that they represented a group of disabled individuals who wanted to attend Yankee games at the Stadium and asked that the Yankees "provide a fair number of wheelchair spaces, on the field level and elsewhere, with sight lines and pricing options comparable to all other stadium seating." Westreich Aff., Ex. A (July 7, 1998 letter from Robert Westreich to Lonn Trost, Esq., Executive Vice President of the Yankees). Over the next three weeks, K & W exchanged letters with the Yan-

kees. *See id.*, Exs. B–E (letters between Westreich and Trost). The final letter, sent by the Yankees on July 27, stated: "As I indicated in our prior telephone conversation, the matter is in litigation instituted by the Justice Department and will be governed accordingly." *See id.*, Ex. E (July 27, 1998 letter from Trost to Westreich). But K & W notes that the Government had not instituted litigation against the Yankees at that point. *See* Westreich Aff. ¶ 3; Goldstein Decl. ¶¶ 2–3. According to K & W, the Government "denied that the dispute was in litigation, would not say whether litigation was planned, and was willing to disclose only that it and the Yankees had been in discussions for several years." *See* Reply Affidavit of Robert Westreich, Esq., counsel for the private plaintiffs ("Westreich Reply Aff.") ¶ 9; Westreich Aff. ¶ 3.

K & W unsuccessfully attempted to interest both the Eastern Paralyzed Veterans Association ("EPVA") and the New York Lawyers for Public Interest ("NYLPI") in participating in a suit against the Yankees. *See* Westreich Aff. ¶¶ 4–5 and Ex. F (Affidavit of James J. Weisman, Esq., Association Executive Director of Legal Affairs for EPVA). Both the EPVA and the City previously had discussed with the Yankees whether the Stadium was in compliance with the ADA. *See id.* ¶¶ 3–4. In November 1998, K & W decided "to take the burden and the risk" and sued the Yankees on behalf of the private plaintiffs, alleging that the Yankees' premises, practices, and policies violated both the ADA and applicable New York law. *See id.* ¶ 6 & Ex. G (private plaintiffs' Complaint). More specifically, the Complaint alleged that the Yankees provided only two locations where wheelchair users could watch a game and that those areas cost more, were less desirable, and isolated wheelchair users from their companions and other patrons. *See id.*

The Yankees then invited K & W to a meeting, held on December 23, 1998 and attended by both the Yankees and the

City. *See* Westreich Aff. ¶ 7; Declaration of Christopher J. Collins, counsel for the Yankees ("Collins Decl.") ¶ 2. Noting that the Government was investigating ADA compliance at the Stadium, the Yankees asked K & W to dismiss its Complaint. *See* Westreich Aff. ¶ 7; Collins Decl. ¶¶ 3–4. According to the Yankees, K & W was asked for specific proposals to improve accessibility at the Stadium but "their only response was that the Stadium should be made fully accessible." Collins Decl. ¶ 4. The Yankees also claim that they offered to work with K & W to resolve the issues raised in the Complaint without litigation. *See id.* K & W notes that all offers of negotiation were conditioned on dismissal of the Complaint, which K & W refused to do. *See* Westreich Aff. ¶¶ 7–8; Westreich Reply Aff. ¶ 11.

On January 5, 1999, K & W served its Initial Notice to Produce, which contained 27 requests for documents. *See* Goldstein Decl., Ex. 3 (Notice to Produce). K & W then served an initial set of 13 interrogatories on January 7 and a supplemental set of 4 interrogatories on January 13. *See id.* (Interrogatories and Supplemental Interrogatories). On January 28, 1999, the Government moved to intervene and added the City as a defendant. *See* Westreich Aff. ¶ 9; Goldstein Decl. ¶ 2. The Government served its own set of interrogatories and document requests on February 25, 1999. *See* Goldstein Decl., Ex. 2 (Plaintiff–Intervenor's First Set of Interrogatories and Document Requests to Defendant New York Yankees). The Government also served numerous third-party subpoenas, noticed and took the depositions of seven City and Yankee witnesses, and negotiated the terms of Confidentiality Stipulations. *See* Goldstein Decl. ¶ 6. Of the 1240 pages of deposition transcripts, the questioning by K & W totaled 32 pages. *See* Goldstein Decl. ¶ 10.

The Court issued several opinions in this case. *See Pascuiti v. New York Yankees,* 98 Civ. 8186, 1999 WL 983882 (S.D.N.Y. Oct.29, 1999) (resolving City's assertion of privilege in response to the Government's request for documents); *Pascuiti v. New York Yankees,* 98 Civ. 8186, 1999 WL 1102748 (S.D.N.Y. Dec.6, 1998) (clarifying burden of proof under Title III of the ADA); *Pascuiti v. New York Yankees,* 87 F.Supp.2d 221 (S.D.N.Y.1999) (clarifying burden of proof under Title II of the ADA). Prior to settling the case, the parties had fully briefed a motion for partial summary judgment. For all of these motions, the only brief filed separately by K & W was a 3–page reply brief on the summary judgment issue. *See* Westreich Aff., Ex. Q (Reply Memorandum of Private Plaintiffs in Support of Motion for Partial Summary Judgment). According to K & W, it had prepared its own motion for partial summary judgment in June 1999, but the Government asked K & W not to proceed because it wanted to pursue a different theory of liability. *See id.* ¶¶ 14–17. K & W decided not file its motion "in the interest of unity among Plaintiffs' counsel," but now contends that "whether [it] should have acquiesced is arguable." *Id.* ¶ 18.

During the week of December 6, 1999, the parties engaged in intense settlement negotiations. *See* Goldstein Decl. ¶¶ 17–19; Westreich Reply Aff. ¶ 18. According to the Yankees, these negotiations usually involved two attorneys for the Yankees, one or two attorneys for the City, and four attorneys for the Government. *See* Goldstein Decl. ¶ 17. The Yankees contend that K & W only attended the beginning of a meeting on December 6, for no more than half an hour. *See id.* ¶ 18. On the other hand, K & W emphasizes that one or both of its attorneys attended long conferences at the Government's offices on both December 6 and December 10 (although it is not clear whether the Yankees and the City were present) and it had telephone conferences on other days. *See* Westreich Aff., Ex. O; Westreich Reply Aff. ¶ 18. The negotiations led to a comprehensive Settlement Order signed on December 13, 1999.

The Settlement Order contained two paragraphs about costs and attorney's fees:

> The Government on the one hand, and the City and the Yankees on the other hand, shall bear their own costs and attorney's fees in this action.

> Without admitting any liability therefor, the Yankees shall attempt to negotiate and settle the issue of the amount of attorney's fees and costs requested by Kopelson & Westreich, as counsel for plaintiffs, pursuant to 28 C.F.R. § 36.505. In the event that the Yankees and Kopelson & Westreich cannot resolve the issue, Kopelson & Westreich shall submit a fee application to the Court within 45 days of the date of the Court's entry of this Stipulation.

Westreich Aff., Ex. N (Settlement Order), ¶¶ 72–73. K & W submitted a timely request for $316,192.50 in fees and $2,237.05 in costs. *See id.* ¶ 40; Westreich Reply Aff. ¶ 36. The Yankees oppose this request, arguing both that K & W is entitled to no fees and that the requested amount is excessive and unreasonable.

## II. DISCUSSION

### A. Entitlement to Any Fee Award

At first glance, K & W appears to be entitled to attorneys' fees in this case. *First,* the ADA clearly provides for payment of attorneys' fees:

> In any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs....

42 U.S.C. § 12205; *see also* 28 C.F.R. § 36.505 (same). *Second,* the private plaintiffs qualify as a prevailing party under the relevant standard:

> [T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff. Only under these circumstances can civil rights litigation effect the material alteration of the legal relationship of the parties and thereby transform the plaintiff into a prevailing party. In short, a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (quotation marks and citations omitted). There is no question that the lawsuit filed by the private plaintiffs modified the Yankees' behavior in ways directly beneficial to those plaintiffs.

The problem is that the Government intervened in the private plaintiffs' lawsuit two months after it was filed and, as K & W admits, "the Government's attorneys were lead counsel" in the case. Westreich Aff. ¶ 22. On that basis, the Yankees contend that K & W merely rode the coattails of the Government's investigation and added nothing to the eventual settlement. The Yankees argue that K & W filed its lawsuit with full knowledge that the Government had been investigating the Stadium for more than four years and negotiating with the Yankees over proposed changes. The Yankees also contend that K & W played a minor or nonexistent role in the various stages of this case—discovery, motion practice, trial preparation, and settlement talks—and failed to sue the City, a major participant in the eventual settlement. In short, the Yankees allege that, even though the lawsuit filed by K & W achieved the relief it sought, the Gov-

ernment would have achieved the identical relief without its minimal participation. K & W, for its part, claims that the Government's failure to file a lawsuit against the Yankees only serves to demonstrate how K & W's lawsuit spurred action in—and an eventual resolution of—this matter. In addition, K & W argues that it collaborated with the Government in an effort to reduce costs and avoid duplication of services.

In an analogous situation, the Second Circuit enunciated some principles for determining whether a party is entitled to attorneys' fees:

> To justify an award of ... fees, the prevailing party must show a causal connection between the relief obtained and the litigation in which fees are sought. A causal connection exists if the plaintiff's lawsuit was a catalytic, necessary, or substantial factor in attaining the relief. The inquiry into causality is largely factual, and the findings of a district court on these matters will be set aside only if clearly erroneous. In cases where several parties seek similar relief, the district court will normally be in the best position to determine whether a particular lawsuit was a significant catalyst in bringing about the relief sought.... [A] duplicative action which contributes virtually nothing to the ultimate result cannot justify an award of counsel fees. The purpose of such awards is to encourage the redress of civil rights violations. Where that goal is fully achieved by a single well-managed action, an award of compensation to latecomers who add nothing of value would encourage the bringing of superfluous litigation solely for an award of fees.

*Gerena–Valentin v. Koch*, 739 F.2d 755, 758–59 (2d Cir.1984) (quotation marks and citation omitted). The Second Circuit then affirmed the denial of attorneys' fees because the party seeking fees filed a complaint that "merely aped the model" already filed by the other parties and "made no appreciable contribution at oral argument on the motion for a preliminary injunction." *Id.* at 579 (quotation marks and citation omitted).

This case is distinguishable from *Gerena–Valentin* on both procedural and substantive grounds. Procedurally, K & W filed its complaint before, not after, the Government and therefore did not merely copy the Government's complaint. Although the Yankees contend that the Government had conducted a substantial investigation by the time K & W filed its lawsuit, K & W credibly argues that its lawsuit spurred the Government into action. Substantively, K & W played a much more active role than the party seeking fees in *Gerena–Valentin.* As detailed above, K & W filed document requests and interrogatories and prepared a motion for summary judgment that it never submitted. *Cf. Gerena–Valentin,* 739 F.2d at 759 ("Since Gerena–Valentin's role was limited to the bringing of a repetitive action and the offering of inconsequential legal arguments in seeking an injunction, it was not error to deny counsel fees."); *California Public Interest Research Group v. Shell Oil Co.,* C92–4023, C93–0622, 1996 WL 33982, at *2 (N.D.Cal. Jan. 23, 1996) (denying request for attorneys' fees because requesting party's "contribution to both the litigation and results achieved in this case was at most de minimis because it played an almost entirely passive or duplicative role.").

■ Because its efforts constituted more than de minimis participation and because those efforts contributed to the eventual resolution of this case, I conclude that K & W is entitled to recover some amount of attorneys' fees and costs. Nevertheless, as set forth below, the principles of *Gerena–Valentin* play a critical role in determining the amount of the fee award. K & W must demonstrate a causal connection between its efforts and the relief obtained by showing that those efforts were a "catalytic, necessary, or substantial factor in attaining the relief." *Gerena–Valen-*

*tin,* 739 F.2d at 758–59 (quotation marks and citation omitted); *see also Farrar,* 506 U.S. at 114, 113 S.Ct. 566 (explaining that while "the prevailing party inquiry does not turn on the magnitude of the relief obtained," the degree of success obtained is "the most critical factor in determining the reasonableness of a fee award.") (quotation marks and citation omitted).

## B. Amount of the Fee Award

 Both parties agree that the lodestar method is the proper approach for evaluating K & W's request for attorneys' fees. The lodestar figure "is arrived at by multiplying the number of hours reasonably expended on the litigation ... by a reasonable hourly rate." *Gierlinger v. Gleason,* 160 F.3d 858, 876 (2d Cir.1998) (quotation marks and citation omitted). The party seeking attorneys' fees bears the burden of demonstrating that the claimed rate and number of hours are reasonable. *See Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ("When ... the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee ...."); *see also Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed."). "The task of determining a fair fee requires a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." *Lunday v. City of Albany,* 42 F.3d 131, 134 (2d Cir.1994).

### 1. Reasonable hourly rate

 K & W argues that $325/hr is a reasonable billing rate for both Robert Westreich, an attorney with 29 years of experience in civil rights and civil liberties

litigation, and Edward Kopelson, an attorney with 28 years of experience .in the same fields. *See* Westreich Aff. ¶¶ 31–33. Both Kopelson and Westreich have particularized experience in disability law. *See id.* ¶¶ 31–32. K & W contends that "[p]revailing rates in Manhattan among attorneys with comparable experience range from $300.00 to $350.00." *Id.* ¶ 33. To support this rate, it has submitted a certification from Lawrence M. Solan, associate professor of law at Brooklyn Law School and former partner at Orans, Elsen & Lupert, LLP, a nine-lawyer litigation firm. *See* Westreich Aff., Ex. S (Certification of Lawrence M. Solan). Professor Solan states that his time was billed at $350/hr before he left private practice and that "the most prevalent rates for civil rights lawyers appears [sic] to be in the neighborhood of $325 to $350 per hour, although rates do vary." *Id.,* ¶¶ 7–8.

I conclude that a rate of $250/hr is more reasonable. The Second Circuit has made clear that "smaller firms may be subject to their own prevailing market rate." *Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d 1053, 1059 (2d Cir.1989); *see also Algie v. RCA Global Communications, Inc.,* 891 F.Supp. 875, 895 (S.D.N.Y. 1994) ("[I]f the movant is represented by a small or medium-size firm, the appropriate rates are those typically charged by such firms, whereas a movant may obtain higher compensable rates if represented by a large urban firm, since such firms typically charge more per hour to cover a higher overhead."), *aff'd,* 60 F.3d 956 (2d Cir. 1995). My research reveals that the range of fees in this District for "seasoned civil rights litigators," particularly those in small firms, is between $200/hr and $300/hr.[2] *See Gavin–Mouklas v. Information Builders, Inc.,* 97 Civ. 3085, 1999 WL 728636, at *5–6 (S.D.N.Y. Sep. 17, 1999) (noting that "the acceptable range seems to be between $200 and $300" for "part-

---

**2.** Although the Yankees argue that K & W's usual rate is between $150/hr and $200/hr, they provide no support for that assertion.

ners at small law firms in New York City"); *Greenbaum v. Svenska Handelsbanken,* 998 F.Supp. 301, 304, (S.D.N.Y. 1998) ("Review of recent attorneys' fee awards in the Southern District of New York reveals a preponderance of awards at $250/hr for seasoned civil rights litigators.").

Professor Solan indicated that he had "called a few lawyers ... and looked at fee application cases filed in this Court under various statutes" to arrive at his suggested rate of $325 to $350 per hour, but he does not include any citations. *Cf. Gavin–Mouklas,* 1999 WL 728636, at *6 ("Defendant has provided me with data and charts, showing various hourly rates for partners at various size firms in New York City."). While I recognize that Professor Solan's suggested rate is based in part on his own experience at a small law firm, that anecdotal evidence does not outweigh the results of my research which, combined with my own experience, leads me to conclude that $250/hr is a reasonable rate in this case. *See Miele v. New York State Teamsters Conference Pension & Retirement Fund,* 831 F.2d 407, 409 (2d Cir. 1987) ("[W]e do not share the view ... that a district judge may not rely in part on the judge's own knowledge of private firm hourly rates in the community.").

### 2. Number of hours reasonably expended

K & W seeks reimbursement for 1008.9 hours of work. The Yankees make a number of specific objections to the hours claimed by K & W. In addition, the Yankees make a general objection to the reasonableness of K & W's request, returning to the argument that the Government, not K & W, successfully litigated this case. *See* Part II.A *supra.*

#### a. Specific objections

##### i. Work that could have been done by others

The Yankees argue that K & W billed for 5.7 hours of work that could have been done by paralegals. *See* Collins Decl., Ex. 15 (list of "Filing/Clerical" entries). My review of those entries indicates that only 2.5 hours involve truly clerical tasks, while the rest involve drafting verifications and deposition notices. *See id.* For the 2.5 hours involving faxing, filing, photocopying, and drafting affidavits of service, the reasonable fee is $50/hr. *See Luciano v. Olsten Corp.,* 925 F.Supp. 956, 966 (E.D.N.Y.1996) (reducing fees for clerical work performed by attorney to $50/hr), *aff'd,* 109 F.3d 111 (2d Cir.1997).

The Yankees also argue that K & W's bills should be reduced by 66% because the tasks could have been performed by junior associates rather than partners. Courts in other cases have made such reductions to ensure that the overall fee was reasonable. *See Plummer v. Chemical Bank,* 592 F.Supp. 1168, 1172 (S.D.N.Y.1984) (reducing fee request by one-half because of numerous inefficiencies, including "$175 per hour partners doing work easily and ordinarily performed by junior associates"); *Beech Cinema, Inc. v. Twentieth Century Fox Film Corp.,* 480 F.Supp. 1195, 1197 (S.D.N.Y. 1979) ("Many of the functions performed by the partners could have been satisfactorily accomplished by associates, with a considerable saving in fees."), *aff'd,* 622 F.2d 1106 (2d Cir.1980). But the Yankees have failed to identify specific items they find objectionable, and my review of K & W's bills does not reveal any obvious inefficiencies. *See Bonner v. Guccione,* 94 Civ. 7735, 1997 WL 441910, at *8 n.10 (S.D.N.Y. Aug. 6, 1997) ("His time records indicated that he performed tasks that an associate would typically perform, including deposition designations."), *vacated on other grounds,* 178 F.3d 581 (2d Cir.1999); *see also Lilly v. County of Orange,* 910 F.Supp. 945, 950 (S.D.N.Y.1996) (defendants challenged specific entries).

Kopelson and Westreich spent time conducting discovery, researching and preparing motions, and discussing the case with

each other, their clients, the Government, the defendants and the Court. They did not have associates to whom they could delegate and, unlike the clerical tasks discussed above, the nature of these tasks do not justify a blanket reduction in fees. *See Lilly,* 910 F.Supp. at 951 ("The proper test is an ex ante, not ex post, inquiry whether or not certain tasks should have been assigned to more junior level attorneys."). This conclusion is supported by the fact that I already have reduced K & W's requested rate from $325/hr to $250/hr. *See Greenbaum,* 998 F.Supp. at 304 ("Review of recent attorneys' fee awards in the Southern District of New York reveals a preponderance of awards at $250/hr for seasoned civil rights litigators.").

### ii. Summary judgment motions

K & W billed for 79.1 hours spent on summary judgment motions. *See* Collins Aff., Ex. 18. This time includes preparation in June 1999 of its own summary judgment motion, which it decided not to file at the Government's request, and review and preparation in September and October 1999 of the filed summary judgment motions. The Yankees argue that all of the time spent on these motions should be eliminated, because K & W did not make a meaningful contribution to the summary judgment briefing.

K & W billed for 49 hours spent on its June 1999 summary judgment motion, which was based on the theory that ADA compliance was readily achievable at the Stadium because one row—Row K—was designed to accommodate wheelchair seating (the "Row K theory"). The Yankees correctly cite the general principle that a party should not be compensated for motions that were never filed. *See Gierlinger,* 160 F.3d at 880 (affirming district court's refusal to award attorneys' fees "for some 35 hours spent preparing

for motions that were never filed"); *see also Smart SMR of New York, Inc. v. Zoning Commission,* 9 F.Supp.2d 143, 152 (D.Conn.1998) (declining to award fees for default judgment that was never filed and unnecessary). In response, K & W argues that this principle should not control the result here because the Row K theory was a sound and persuasive theory that continued to play a role in the case after June 1999.

Although I never considered the merits of the Row K theory, I certainly became familiar with the basic argument, which was certainly not frivolous. K & W presented the Row K theory to this Court, and that theory played a role in this litigation.[3] *See Hensley,* 461 U.S. at 435, 103 S.Ct. 1933 ("Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters."). In order to compensate K & W for developing the theory while eliminating hours spent preparing the motion itself, I have reduced K & W's request by 50%, for a total of 24.5 hours. *See Luciano,* 109 F.3d at 117 ("[A] district court can exclude excessive and unreasonable hours from its fee computation by making an across-the-board reduction in the amount of hours."); *see also Krumme v. WestPoint Stevens, Inc.,* 79 F.Supp.2d 297, 310 (S.D.N.Y.1999) (reducing overall request by 20% to account for duplicative and excessive charges).

Turning to the motions for summary judgment motions that were filed, K & W spent 30.1 hours reviewing the Government's motion and the opposition filed by the Yankees and the City. K & W also drafted its own reply, which totaled three pages and did not contain a single citation. *See* Westreich Aff., Ex. Q (Reply Memorandum of Private Plaintiffs in Support of

---

**3.** Judge Michael J. Dontzin, the court-appointed mediator, confirmed that the Row K theory was a significant topic of discussion between the parties. He also advised me that

K & W played an active role in the mediation effort by attending sessions and commenting on proposals.

Partial Summary Judgment). Because the private plaintiffs were parties to this case, it was reasonable for K & W to review motion papers, consult with the Government, and submit a reply. Nevertheless, K & W has failed to carry its burden of establishing that 30.1 hours was a reasonable amount of time to spend on those tasks. Although K & W argues that the private plaintiffs and the Government were pursuing alternative theories of liability, with the Government stressing that ADA compliance at the Stadium was readily achievable and K & W emphasizing that renovations at the Stadium represented an alteration that triggered heightened ADA liability, there is simply no evidence that the Government and K & W divided the labor in the manner described. Indeed, the available evidence contradicts that assertion, because the Government briefed the alteration issue at the summary judgment stage.

This deficiency highlights a larger problem with K & W's fee request, which did not include an affidavit from the Government attorneys explaining the nature and extent of the collaboration between themselves and K & W. In its reply, K & W emphasized the collaborative nature of this lawsuit and stated: "If the [Yankees] really doubted the extent of that collaboration, [they] simply would have asked the Government, something [they have] not done." Westreich Reply Aff. ¶ 3; *see also id.* ¶ 34 ("If the Yankees really wanted to question Plaintiffs' teamwork, they would have and could have asked [the Government's attorneys]. That they did not makes their opposition to this application hollow."). But K & W, not the Yankees, bears the burden of establishing that the hours it expended were reasonable. Because K & W has not justified the expenditure of 30.1 hours on the filed summary judgment motions, that request is reduced by 50%, for a total of 15 hours.

4. I did not include the first entry identified by the Yankees, because that entry does not ap-

### iii. Burden of proof motions

K & W billed for 18 hours spent reviewing, analyzing and discussing the burden of proof issues in this case. *See* Collins Aff., Ex. 20. It did not, however, submit any motion papers on these issues. As noted above, K & W could spend a reasonable amount of time becoming familiar with the issues in this case. *See* Part II.B.2.a.ii *supra.* Because 18 hours is an unreasonable amount, however, that request is reduced by 50%, for a total of 9 hours.

### iv. Preliminary injunction motion

K & W billed for 18.9 hours spent researching and discussing a potential preliminary injunction motion, although it never filed such a motion. *See* Collins Aff., Ex. 19.[4] Unlike the June 1999 summary judgment motion, there is no suggestion that the theories behind the preliminary injunction motion were a substantial factor in this case. As a result, all 18.9 hours attributable to the preliminary injunction motion are eliminated. *See Gierlinger,* 160 F.3d at 880 (affirming district court's refusal to award attorneys' fees "for some 35 hours spent preparing for motions that were never filed"); *see also Smart SMR,* 9 F.Supp.2d at 152 (declining to award fees for default judgment that was never filed and unnecessary).

### v. Experts

▮ K & W billed for 25.2 hours spent discussing and consulting with experts. *See* Collins Aff., Ex. 13. The Yankees contend that all of this time should be eliminated, because K & W never identified an expert who prepared a report. But K & W did work with one expert, Dr. M. Ala Saadegh–Vaziri, who submitted a 2–page certification on the issue of whether certain changes to the Stadium were readily achievable. *See* Westreich Aff., Ex. K (Certification of M. Ala Saadegh–Vaziri, Ph.D, PE). In addition, K & W argues

pear to be related to the preliminary injunction motion.

that its other expert gathered valuable data and subsequently was retained by the Government for related purposes. As a result, K & W should be fully compensated for its time spent on experts.

### vi. Lack of meaningful description

■ The Yankees argue that 180.9 hours billed by K & W were too vague to merit compensation. *See* Collins Aff., Exs. 31–39. These entries include correspondence and telephone conferences (totaling 111.9 hours) and miscellaneous vague entries (totaling 69.0 hours). "The burden is on counsel to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested." *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1265 (2d Cir.1987). Courts have reduced or eliminated requests where the descriptions are too vague to assess reasonableness. *See id.* ("Katz's time sheets, for example, customarily described his activities in no more than two or three words for any given day, such as 'Rev. Docs' and 'Clients re testimony.' "); *see also Bonnie & Company Fashions Inc. v. Bankers Trust Co.,* 970 F.Supp. 333, 342 (S.D.N.Y.1997) ("The overwhelming majority of [the] entries utterly fail to shed light on the manner in which the firm's lawyers and staff spent their time in this matter.").

There is no question that many of the examples identified by the Yankees fail to identify the subject matter of the phone call, correspondence or other tasks. Nevertheless, courts have made clear that "in many instances the context of vague entries is made clearer by entries following it." *Meriwether v. Coughlin,* 727 F.Supp. 823, 827 (S.D.N.Y.1989). When the entries identified by the Yankees are placed in the proper context, their reasonableness becomes apparent. For example, the Yankees object to the entry "Draft ltr to Yankees" dated July 7, 1998. *See* Collins Aff.,

Ex. 33. But the Yankees received a letter from K & W that very same day. *See* Westreich Aff., Ex. A (July 7, 1998 letter from Westreich to Lonn Trost, Executive Vice President of the Yankees). Similarly, the Yankees object to the entry "TC w/R. Goldstein" dated February 9, 1999. *See* Collins Aff., Ex. 36. But the parties had a conference with the Court that same day. *See* Westreich Aff., Ex. O (complete list of time entries).

I will not compare the entire list of challenged entries against the timesheets and correspondence files in this case, because I seriously doubt the Yankees have done so. Suffice it to say that even a cursory attempt to place the challenged entries in context reveals their inherent reasonableness. *See Lenihan v. City of New York,* 640 F.Supp. 822, 826 (S.D.N.Y. 1986) ("[I]t is clear from the context in which these entries occur what work was involved."). Any lingering doubt about their reasonableness is assuaged by the fact that the vast majority of these entries are less than one hour, and many are less than half an hour. *See October 22nd Coalition v. Safir,* 98 Civ. 7333, 1999 WL 58357, at *1 (S.D.N.Y. Feb. 4, 1999) (stating that "the claim that the billing records are too vague fails to recognize that the level of specificity required should be proportional to the amount of time charged" and holding that "work on the filing of papers" was sufficient to support a charge of ¾ of an hour). Accordingly, no time will be deducted from these entries based on vagueness.

### vii. Conference time/duplicative time

■ K & W billed for 94 hours spent in internal conferences. *See* Collins Aff., Ex. 16. The Yankees argue that this figure is excessive, both because K & W did not spend that much time drafting pleadings, corresponding with the Court, or engaging in discovery and because the descriptions are vague. K & W notes that the total amount of internal conference time averages less than an hour per week. Al-

though K & W certainly had reasons for holding internal conferences, the cursory descriptions of these conferences lead me to conclude that recovery of the full amount—at a rate of $500 per hour ($250 per attorney)—would constitute a windfall. *See Blum,* 465 U.S. at 897, 104 S.Ct. 1541 ("The legislative history [of 42 U.S.C. § 1988] explains that 'a reasonable attorney's fee' is one that is 'adequate to attract competent counsel, but ... [that does] not produce windfalls to attorneys.'" (quoting S.Rep. No. 94–10011, p. 6 (1976))); *see also Gilberg v. Shea,* 95 Civ. 4247, 1996 WL 406682, at *5 (S.D.N.Y. May 31, 1996) ("Excessive staffing and 'office conferences' have been the basis for courts to reduce fee requests by one-quarter to one-third."). Unlike drafting letters or making phone calls to outside parties, internal conferences are harder to verify and therefore more likely to be excessive. *See Bowne of New York City, Inc. v. AmBase Corp.,* 161 F.R.D. 258, 268 (S.D.N.Y.1995) (reducing request by one-half because "both firms spent an excessive amount of attorney hours in ... conferences"). While I have absolutely no doubt that the internal conferences took place as described, I do have concerns about whether all of the conferences were reasonably necessary. *See Blanchard v. Bergeron,* 489 U.S. 87, 96, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) ("[F]ee awards, properly calculated, by definition will represent the reasonable worth of the services rendered in vindication of a plaintiff's civil rights claim."). As a result, these requests are reduced by 25%, for a total of 70.5 hours.

The Yankees also argue that K & W billed 46 hours for tasks performed by both of its attorneys, when only one was necessary. *See* Collins Aff., Ex. 12.[5] K & W correctly points out, however, that these charges include the initial conference with the Yankees, the initial conference with the Court, the initial mediation session, and the initial site visit—all of which reasonably required the attendance of both attorneys. Nevertheless, I will reduce by half the time spent at a July 1999 conference (from 6.5 hours to 3.3 hours) and an October 1999 court conference (from 10.5 hours to 5.3 hours), because those conferences did not reasonably require the attendance of both attorneys. That leaves a total of 37.6 hours.

### viii. Travel time

K & W billed for 85 hours spent traveling to Court, mediation sessions, depositions, or conferences. *See* Collins Aff., Ex. 24. The Yankees argue that this time should be eliminated, or at least drastically reduced, because: (1) K & W failed to include travel time in its contemporaneous timesheets; (2) K & W estimated the amount of time for each trip as 2.5 hours, regardless of the destination or travel conditions; and (3) travel time is rarely productive. K & W responds that its travel time was contemporaneously recorded, although not broken out as a discrete event, and that 2.5 hours is a reasonable estimate.

A review of the billing records indicates that travel time clearly was included in the contemporaneous entries, although it was not listed separately. *Compare* Westreich Aff., Ex. O *with* Collins Decl., Exs. 2, 10, 17, 23, 24. On the other hand, K & W admits that it did not bill for the specific amount of time it took to travel on a given day. The use of an estimate, along with the fact that travel time is less productive than regular time, leads me to reduce the travel time request by 33%, for a total of 56 hours.[6]

---

**5.** The Yankees include in this category allegedly duplicative entries, in which the same attorney appears to have billed twice for the same task. *See* Collins Aff., Ex. 12. But the examples cited by the Yankees are tasks that simply might have taken two occasions to complete, such as reviewing photos or preparing a file memo. K & W has represented to this Court that it has eliminated duplicate record time and other mistaken entries. *See* Westreich Aff. ¶ 27. I accept that representation.

**6.** Because K & W actually took these trips, however, I decline to reduce the costs related with the trips.

### ix. Depositions conducted by the Government

■ K & W billed for 52.7 hours spent attending depositions conducted by the Government (or, in one case, reviewing a deposition transcript). *See* Collins Aff., Ex. 10. The Yankees argue that none of this time is compensable because K & W did not prepare for the depositions and did not help the Government prepare for them. In addition, the Yankees note that questioning by K & W fills only 32 of the approximately 1240 pages of deposition transcripts. *See* Goldstein Decl. ¶ 10. For its part, K & W acknowledges that its request could be cut in half, because the time spent in depositions "could have been avoided." Westreich Aff. ¶ 26; *see also id.* ("It was a lot of time and, although we pursued what we needed to, our participation was limited because the Government's questioning was comprehensive."). On the other hand, K & W asserts that attending the depositions allowed it not to purchase, read, and summarize deposition transcripts and permitted numerous conferences with the Government. As noted above, K & W had a right and obligation to familiarize itself with proceedings in the case. *See* Part II.B.2.a.ii *supra.* I agree that the time should be reduced by 50%, for a total of 26.4 hours.[7]

### x. City-related tasks

■ K & W billed for 19.3 hours spent *researching* issues involving the City, 36.9 hours reviewing documents produced by the City, and 8.2 hours involving the City's assertion of privilege regarding certain documents. *See* Collins Aff., Exs. 3, 6, 25. The Yankees argue that none of this time is compensable because K & W failed to sue the City. Indeed, the Yankees stress this point in their effort to portray K & W as a free rider on the Government's case. K & W responds that, regardless of whether it sued the City, the City's documents provided essential information in pursuing its claims against the Yankees.

After reviewing the invoices submitted by K & W, I conclude the time challenged by the Yankees is fully compensable. K & W clearly contemplated suing the City in July 1998 and February 1999. *See* Collins Aff., Ex. 25. Although it decided not to pursue that theory, its reasonable amount of time researching the issue is compensable. In addition, K & W needed to review the papers submitted by the City on various issues. *See* Part II.B.2.a.ii *supra.* The review of the City's documents related to alterations at the Stadium, which in turn supported the claims of the private plaintiffs against the Yankees. Finally, I cannot say that 8.2 hours spent reviewing and analyzing the City's claim of privilege, which potentially prevented K & W from obtaining some of those important documents, was unreasonable.

None of these conclusions, however, should be read as condoning K & W's failure to sue the City, a major party in the eventual settlement of this action. This general weakness in K & W's case will be addressed below. *See* Part II.B.2.b *infra.*

### xi. Class relief

K & W billed for 2.6 hours spent researching the issue of class relief. *See* Collins Aff., Ex. 30. The Yankees argue that this time is not compensable because it did not relate to the case actually pursued by K & W. Because K & W did not satisfy its burden of demonstrating that this research was reasonably related to the outcome of this case, this request is not compensable.

### xii. Contacts with EPVA and NYLPI

K & W billed for 1.8 hours spent on contacts with the EPVA and 7.2 hours spent on contacts with NYLPI. *See* Collins Aff., Exs. 26, 29. The Yankees argue that this time is not compensable because

7. K & W reduced the rate, rather than the hours, but I use this method for consistency.

the entries fail to specify the reasons for the contacts. In his initial affidavit, however, Westreich explained that K & W was attempting to interest EPVA or NYPLI in taking the case. *See* Westreich Aff. ¶ 5. Once again, viewed in the proper context, these hours are reasonable. *See* Part II. B.2.a.vi *supra.*

### xiii. General education

■ K & W billed for 21.2 hours spent on background research characterized by the Yankees as "general education." *See* Collins Aff., Ex. 27. The vast majority of these entries relate to sports stadiums, a topic clearly and directly relevant to this case. *See New York State Association for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1146 (2d Cir.1983) ("In assessing the extent of staffing and background research appropriate for a given case, a district court must be accorded ample discretion."). K & W should be compensated for this time.

### xiv. Miscellaneous "unrelated" items

K & W billed for 14.2 hours spent on "miscellaneous other tasks." Memorandum of Law on Behalf of Defendant New York Yankees Partnership in Opposition to the Application by Counsel for Private Plaintiffs for an Award of Fees and Expenses ("Yankees' Brief") at 27; *see also* Collins Aff., Ex. 28. The Yankees argue that these entries, both vague and unrelated to the case, are not compensable. In context, the entries are vague but do not appear unrelated. To protect against an inappropriate windfall, these entries are reduced by 50%, for a total of 7.1 hours.

### xv. Attorneys' fees motion

K & W billed for 97.3 hours spent preparing its motion for attorneys' fees. *See* Collins Aff., Ex. 14. In addition, it billed for 6.5 hours spent on its reply brief. *See* Westreich Reply Aff. ¶ 36. The Yankees argue that this time is excessive and that the billing entries are vague and duplicative. In support of its motion for attor-

neys' fees, K & W produced a 10–page brief, a 12–page certification, and 20 exhibits. Although the total number of hours expended is reasonable, not all of those hours should be billed at the partner rate of $250/hr. *See* Part II.B.2.a.i *supra* (lower rate of $50/hr for clerical tasks). Because the entries make it difficult to determine which tasks were clerical, a blanket reduction of 50% is appropriate, for a total of 48.7 hours.

### b. General objection

Applying all of the specific reductions to K & W's fee request, it should be compensated for 793.4 hours at a rate of $250/hr and 2.5 hours at $50/hr, for a total of $198,475. In Part II.A, I concluded that K & W was entitled to recover some attorneys' fees because its efforts constituted more than de minimis participation and contributed to the eventual resolution of the case. At the same time, K & W is required to show that its efforts were a "catalytic, necessary, or substantial factor in attaining the relief." *Gerena–Valentin,* 739 F.2d at 758–59 (quotation marks and citation omitted). Put another way, K & W is entitled to recover only for hours that were reasonably necessary to secure the relief requested. *See Farrar,* 506 U.S. at 114–15, 113 S.Ct. 566 (emphasizing "the court's central responsibility to make the assessment of what is a reasonable fee under the circumstances of the case") (quotation marks and citation omitted).

The key question, then, is whether K & W's time was reasonably spent:

> Fee awards are to be reasonable, reasonable as to billing rates and reasonable as to the number of hours spent in advancing the successful claims. Accordingly, fee awards, properly calculated, by definition will represent the reasonable worth of the services rendered in vindication of a plaintiff's civil rights claim. It is central to the awarding of attorney's fees under [42 U.S.C.] § 1988 that the district court judge, in his or her good judgment, make the assess-

ment of what is a reasonable fee under the circumstances of the case.

*Blanchard v. Bergeron,* 489 U.S. 87, 96, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). I have some concern that a significant amount of time spent by K & W was duplicative of time spent by the Government and did not represent a distinct contribution by K & W. *See California Public Interest Research Group,* 1996 WL 33982, at *3 ("[C]ounsel that play a smaller or secondary role can still make a distinct contribution to the litigation effort or the outcome of the action."); *see also Donovan v. CSEA Local Union 1000,* 784 F.2d 98, 105 (2d Cir.1986) (affirming reduction in requested fees because "[t]hose fees that were granted were predominantly for counsel's work done preliminary to, and not duplicative of, the Secretary's representation."); *Johnson v. University College,* 706 F.2d 1205, 1208 (11th Cir.1983) ("The use in involved litigation of a team of attorneys who divide up the work is common today for both plaintiff and defense work.... [A] reduction is warranted only if the attorneys are unreasonably doing the same work.").

This litigation can be divided into two stages—before and after the Government's intervention. During the first stage, K & W took the initiative. In July 1998, K & W contacted the Yankees in an effort to bring the Stadium into compliance with the ADA. From July 1998 through November 1998, K & W discussed the case with the Government and the Yankees, sought other counsel, and eventually filed this lawsuit. After filing suit, K & W met with the Yankees and served discovery requests. K & W should be fully compensated for its efforts during this first stage.

Once the Government intervened, however, it served discovery requests and numerous third-party subpoenas, took a number of depositions, negotiated confidentiality stipulations, and briefed several motions. Although K & W admits that the Government served as "lead counsel," it nevertheless emphasizes the high degree of collaboration. *See* Private Plaintiffs' Brief in Support of an Award of Attorneys Fees and Costs at 3–6 (arguing that K & W "acted collaboratively" with the Government, "extensive[ly] consult[ed]" with the Government, made decisions "in the interest of unity among Plaintiffs' counsel," and worked together with the Government "in mutual assistance"). It is difficult to determine K & W's role in that collaboration or how it impacted the eventual outcome of the case. What is clear, however, is K & W's minimal role in the significant motion practice and its relatively minor role in the negotiations that produced the Settlement Order. K & W itself makes the following statement regarding its role:

> For the most part ... we eliminated time by not spending it in the first place. We did not, for instance, spend any time on the Yankees' voluminous financial records, spent little time on most motions, and spent no time on trial preparation, despite the proximity and complexity of the trial, because by the middle of November it appeared very likely that a settlement would be reached.

Westreich Aff. ¶ 28.[8]

▉ As noted earlier, K & W bears the burden of demonstrating that the hours requested are reasonable and not duplicative of the Government's efforts. I explained earlier that the lack of an affidavit from the Government attorneys hindered K & W's ability to fully carry that burden. Nevertheless, I am convinced that K & W played more than a de minimis role in this case, even after the Government intervened and even up to the eve of settlement, and that K & W contributed to the eventual resolution of this case. As a result, I conclude that, in addition to the specific reductions already made, all hours

---

**8.** As the Yankees point out, the Government was telling the Court in mid-November, and even early December, that "the parties were still far apart on critical issues and that the Court should not adjourn the trial date." Yankees' Brief at 18.

billed by K & W after the Government intervened should be reduced by 25%.[9] All hours billed by K & W before that date, on the other hand, should be compensated in full.

### C. Final Fee Award

A review of K & W timesheets indicates that it billed 10.9% of its hours before the Government intervened and 89.1% of its hours after.[10] In order to effectuate the reduction described in Part II.B.2.b, I will apply those percentages to the number of hours that remain now that I have eliminated the specific items discussed in Part II.B.2.a and the hours spent on the motion for attorneys' fees—744.7. *See Luciano*, 109 F.3d at 117 ("[A] district court can exclude excessive and unreasonable hours from its fee computation by making an across-the-board reduction in the amount of hours."). That calculation yields 81.2 hours that should be billed in full (the proportion billed before the Government intervened) and 663.5 hours that should be reduced by 25% to 497.6 hours (the proportion billed after the Government intervened). I add to that the compensable hours spent on the attorneys' fees motion (48.7 hours) for a total amount of 627.5 compensable hours. At a rate of $250/hr, this yields a fee award of $156,875.

To that figure, I must add the 2.5 hours billed at $50/hr, which brings the total fee award to $157,000. In addition, K & W requested $2,237.05 in costs, all of which should be granted.

### III. CONCLUSION

For the foregoing reasons, the request for attorneys' fees and costs is hereby GRANTED in the amount of $159,237.05.

9. This does not include K & W's motion for attorneys' fees, which it handled on its own. Aside from the reduction already made, *see* Part II.B.2.a.xv, those hours should be fully compensated.

The Clerk of the Court is directed to close this case.

10. These percentages exclude the hours spent on the attorneys' fee motion.